Anyone who's arguing that didn't sign in? Your name, sir? Joseph Duhamel. I'm Daniel Weissman. Third one? Is that your last name? Yes. One, two, three, and four. Three? Yes. No?  John? Thank you very much. Thank you. Oh, he was wrong. Hi.  Okay, so the Grosvenor case is here. Um, and then I'm just going to say two more people. So I guess we can start when you're ready. And then we'll move to... Um, Blakehead, and then the Epstein-Lewis case. Okay. All right, no problem. Okay, okay. Great. No problem.   Judges of the United States Court of Appeals for the Second Circuit. Hoyes, hoyes, hoyes. All persons having business before this, a stated term of the United States Court of Appeals for the Second Circuit, draw near, give your attention, and shall be heard. God save the United States of America and the Congress of the Court. Please be seated. Good morning, everyone. We are pleased to hear that counsel are here in some of the cases initially. I understand a couple of attorneys for the later cases on today's calendar are not quite here yet, but that won't start us, but won't prevent us from getting rolling on the first cases. What I will ask you to do as counsel come up for each case is please make sure you take a second when you get to the podium. Please do adjust the microphone, and if you need to, there is a black switch on the side that I think raises and lowers the podium. We won't take this time away from you. Please get settled at the podium. We want to make sure that we do not miss a single word of what are sure to be very helpful oral arguments. So with that, why don't we hear from the appellant in the first case, 25-291, Delray Richardson v. Town Square Media. I understand we have Mr. Sanders? Yes, Your Honor. And that you would like to reserve one minute for rebuttal. Is that right? That's correct, Your Honor. Okay, we're ready when you are. May it please the Court, my name is Craig Sanders. I'm here for the appellant Delray Richardson. This appeal presents three issues, Your Honor. The first issue, and I'll deal with them in turn, is the Court's ruling that the usage by the defendant was de minimis. What is at issue in that ruling is an extraction of a single frame from a video. And the Court, in doing its analysis, ignored 106.5 of the Copyright Act. Before you get into the meat and potatoes of your argument, you said you have three issues. I would love it if you would just tell us what those three issues are so we know what the roadmap will be, and then you can dig into the meat of whatever you want first. Okay, fair enough. The second issue is the Court's ruling on fair use. Okay. And the third issue is the Court's ruling on YouTube licensure. Okay, great. And, again, pardon the interruption, but I'm happy to now let you follow whatever path you think is most useful.  I mean, on the de minimis issue, Your Honor, I think this is the one that's most easily dispensed with. The statute, 17 U.S.C. 106.5, expressly reserves the right to individual frames from a video, which is what occurred here. The defendant extracted a single frame and used it as the cover art for one of its stories on its website. I think what is going on, and, unfortunately, it's going on now. And the district court said because there's just a lot of frames in a video, taking out one frame isn't a lot of the work, right? That's basically what the district court said. Basically what the ruling is, yeah, but in so doing it kind of turned the seminal decision on this topic, Ringel, upside down. In Ringel, the question was a movie poster that was on the wall of a set that was seen in passing seconds, 27 seconds total of the whole movie, whether or not you saw enough of it and clearly enough of it for it to be actionable copy. And it probably also matters that it's in the background of a movie only for a fleeting moment as opposed to the central feature of an article. Correct, but what we were doing in that… OK, so I get that argument. But then why isn't it – why aren't the still frames perhaps fair use? So let's say – I mean I think that maybe it's more straightforward to think about the interview, the Mel-Mel interview, right? So it's got to be the case that if the original work is an interview that involves question and answer with the subject and so on and a news organization thinks that the substance of the interview is newsworthy, taking a still frame that's just a picture of the subject of the interview that does not include any of the content of the interview or any of the real purpose of the original work, why wouldn't that be fair use just to illustrate a news story about the substance of the interview? Well, if we're looking at fair use merely because it is a single frame from a larger work, then we would basically be unwriting… You know, that's what I'm saying. So I'm saying – let's say I don't agree with the district court. I don't think it's just because it's a still frame from a larger work, right? But the fair use is about the nature of the work and the amount of the original work. And so here I'm making a kind of qualitative analysis, which is if the original work is an interview that involves questions back and forth, no one could possibly think that a still frame photo of the subject of the interview that does not include any of the content of the interview would be a replacement for the original video, right? Well, it depends on the nature of the video and what was extracted from it. I don't disagree if it's two people sitting in chairs across from one another conducting an interview. The picture of them sitting there doesn't do much. It's not like a meaningful part of the original work. Put it another way. Isn't this just – I was surprised that you started with this because isn't this just a sort of subset of the fair use argument in the sense that significant work is done for you in the fair use argument about the Michael Jordan tape by the fact that they took all of it and that it could be arguably a replacement for the original in a marketplace because if you can see the whole thing on Town Square's site, you don't have to license anything from your client or buy anything from your client. But if it's only one frame, it clearly couldn't be a replacement for the entire thing, right? And certainly there's a fair use factor about the quantity and that would count strongly for the defendant in a fair use inquiry. So, you know, it seems to me that's really what the district court was saying by its de minimis was sort of short-cutting the other fair use factors and saying the fact that it's only one frame ends it. But like Judge Manasci, I don't agree with that. I agree with you that that is at most one factor in the fair use analysis. But it's hard for me to see how the other factors could cut your way on a single frame. Well, the least important factor that exists in the fair use analysis is the quantity of the work used. Oh, I wouldn't say that. Excuse me. That certainly is not true. And all of these factors can be more or less important depending on the context, right? In Harper Collins, the fact that it was such an extensive excerpt from the book was driving the case. So sometimes if it's a real lot, that cuts very strongly, and if it's a real little, that might cut strongly the other way. It doesn't mean you don't have to analyze the other factors. But that's why I'm wondering why we're spending so much time on one frame, the economics of which are probably pretty de minimis compared to the other issues. In other words, if you lose the other things, you're not getting much out of the single screenshot, are you? Well, now that we've moved more progressively into online media and videography, and even small clips like your iPhone will make is more than a single frame now. It's a few seconds of frames. So we're talking about where we are now as a society, which is video is more prevalent than still imagery. But it's still what you're seeing in the screenshot story. And I still marvel that we're seven minutes into the argument. That's the only thing we've talked about. It's still one picture of a guy. There are millions of pictures of the guy out there. They could have chosen another one. I guess that counts for you. But they've got this one. What's the big deal? Well, I don't know. Do you agree that? So I started with the interview because it's got to be the case that the still frame of a subject of an interview doesn't really tell you much about the substance of it. Could the Michael Jordan video be different? So if the purpose of the original video there was to document Michael Jordan getting into an altercation, might it be more plausible that a still frame of Michael Jordan getting into an altercation serves the same purpose as the original work and might even be a replacement for it? I would argue that, Your Honor. There will be some cases. I mean, I don't know if this is one, but I'm inviting you to say that it is, in which an original video, the most important feature of it might be one iconic image that's part of the original thing. And maybe capturing that image out of it would be basically reproducing the most important aspect of the work. Well, I'd make two points on this, Your Honor. One is that quite frequently when observing a web page, even when there is the opportunity to play a video, we're satisfied as the user with the cover page. So we've made a choice, and that is a marketplace choice, that we've seen enough just by looking at the one image. Isn't the actual picture of Michael Jordan that we're talking about a kind of blurry in profile? He's looking at this other guy. You can't tell anything about who's to blame or whether Jordan is the hero of the story coming to the rescue of somebody being attacked or whether there's even any kind of attack or physical stuff going on at all. So, I mean, how would you, in theory, you've got a point, how do you defend it with respect to this particular image? Well, Michael Jordan is selling the story, and this is probably the clearest on-point image of Michael Jordan from the clip because it's an action clip of him intervening in a fight. Well, if he's selling the story, that might be to your advantage because maybe then your story can be bought or licensed or something. It's really what carries the sting in this instance is that they took the whole thing. Yes, I mean, we're kind of dancing around the district court's decision quite a bit because the district court's original focus. Yeah, right. It can be wrong, but we can affirm on any ground that appears in the record that explains it to us. And I'm still wondering why the heck we're talking about one frame when you've got two situations in which they took your whole entire product and have different rationales for it, which seem to me by far the more important issues in the case. I don't disagree as it relates to just this one case that Your Honor is 100 percent correct, but we have seen this decision now spawning other issues. We only have one case in front of us. I know. The de minimis, the words de minimis are causing some issues. Can we do this? I think we've – Can we go forward? You raised three issues in your roadmap. I don't think you're going to have time to get to all three. We've now talked a lot about the de minimis. Would you move to the fair use issue about the full video? Sure. I mean, we've got limited time. Yes. Let's make sure that you spend some time on that, which I think is where some of this discussion is going. Correct. So on fair use, Your Honor, the court really took a pre-Warhol analysis, and Warhol has changed the roadmap for looking at fair use. Why do you say that? That's a very mysterious argument to me. You're saying Warhol changes the landscape because it changes the way we think about transformative? Is that the idea? Correct, Your Honor. Yeah, okay. That's not a big deal really. I mean, it was a big deal for Warhol. It's a big deal for the art world because of the specific factors that come into play there. But I'm not sure that – it's still the same analysis. The question is still, is this a transformative use? That's still only one factor of four that have to be balanced against each other. So let's focus on whether it is a fair use, not about what Andy Warhol has to say about this. Correct, Your Honor. But in focusing on the transformative nature, the first question is commerciality, and the second question is purpose and character of use. Yeah, these are – They're setting the bar for how high your transformative – how transformative you need to be for it to be considered fair. Okay, so why isn't it at least somewhat transformative that an article is commenting on the existence and virality of a particular segment? That is a newsworthy topic in itself, and it is distinct from the newsworthiness of the Michael Jordan story itself to the extent that that story was in 2015 and this one is in 2023. Well, it's just a revived usage of the video, Your Honor. I mean, here we have the circumstances where my client was fortunate to be present at this event, videoed the event, and therefore created a work that became valuable. Also, I mean, is it even true – I mean if you read the article, it does not comment on the virality of the video. It doesn't even say that this video is 10 years – has resurfaced 10 years after it was really taken. It just comments on the altercation with Michael Jordan, right? Correct, Your Honor. It basically just walks you through what you're going to see if you hit play. And then the district court says it's not possible for them to have used less of the work because they were embedding like another post, right, something to that effect? Yes, Your Honor. Now obviously it was possible because they took a frame and put it at the top of the article, right? That's correct, Your Honor. So like within this very article, the user used less than the complete work at another part of the article, right? Yeah, they missed the story that they're allegedly telling, which is purportedly that this resurfaced because there was some controversy over the participants. And that's not the focus of the article. It doesn't necessitate the use of the video, which is one of the things that the district court is arguing about. Isn't your strongest point that they took the entire thing and this could be, which is the most important factor of all under Andy Warhol included, that it could be a substitute for what your client can do to market this? And the district court said otherwise on the pleadings without any discovery or factual inquiry into exactly how your client makes money and what kind of markets there are out there. How does he profit from his work? And to what extent could this use of this video undercut that? And it seems to me there's no way that we could say on the pleadings that, oh, we know the answer. This couldn't be a substitute for what your client does. We don't even know what your client does to make money with this, right? Correct, Your Honor. We have nothing in this record. There is no record. We don't know how the marketplaces operate. We know very little about that. And the defendant wasn't called upon to prove any facts, which is their burden to carry as an affirmative defense. So on a judgment on the pleadings, this was an error to have decided it at this time. The court should have developed a record. If the article had described the contents of the video to comment on it as a news story but didn't embed the video, that would not be a use, right? That's correct, Your Honor. If it had links to the video, that also would not be a use because it would still drive traffic to the original licensed user of the video, right? If it had just a visible click here link, Your Honor, yes, that's correct. So the problem is that it reproduced it on its own website, which means that a user is going to be able to consume the video without going to the publication that was licensed by the copyright holder. That's correct, Your Honor. Okay. I think we've heard your argument. You've reserved a minute for rebuttal. Why don't we hear from counsel for the appellee? We have Attorney Everdell. Good morning, Your Honors. Thank you very much. Abigail Everdell from Davis Wright Germaine for appellees. Would you mind tilting your microphone up? Is that better? Thank you, Your Honor. May it please the court. In 2023, Town Square published three videos and news articles on its XXL Magazine website. They were concerning videos authored by a palant. And within these articles, Town Square made justified use of the videos consistent with de minimis use, fair use, and pursuant to the YouTube terms of service. Well, those are all three separate defenses or arguments. And each one, interestingly enough, relates to a different piece of the case, right? Yes, Your Honor. Yes, that's correct. I want to go straight to fair use because I think that's where this court is focused. But I will note that I think that the de minimis use argument, I understand the court appears to be skeptical of this. But I think it's really strong here because I think we have to— Well, wait. Is it strong with respect to the single screenshots? Yes, Your Honor. And you, too, want to talk mostly about what is a single screenshot worth at the end of the day? I mean, I suppose there are statutory damages or something. But what about—isn't the real issue of fair use in this case? They took—you took the whole thing. And it's arguable, it seems to me. It's plausible. It's even likely that the result of that is that someone who wants to see the Michael Jordan video and figure out for himself or herself whether Jordan is a hero or a villain or just what the gossip value of this story is, they don't have to go to the licensed use. They can go to your website instead and see that. And however the plaintiff makes any money off his work, you are arguably a whole substitute for that. How could we decide on the pleadings that this is obviously fair use because, after all, there are four factors that we have to consider here. Yes, Your Honor. And balance them against each other. And the most important one is the last. Yes. Well, I'd like to push back on one thing, Your Honor. The story—the article here, certainly it was absolutely relevant that Michael Jordan intervened into this confrontation. But what the article was about was a mystery over who the third man in the confrontation was. So there was a confrontation between a minor celebrity and somebody who was not pictured in the video. And Michael Jordan ultimately intervened, which was an improbable and funny event, and that made this newsworthy. But what was really curious was that years after the fact, this video had been posted to social media. I mean, I know that's curious, but as I pointed out a moment ago, the article doesn't even say anything about how it's years after the fact. It just comments on the event itself. You're right, Your Honor. But the article does talk about the mystery of who else was involved and the virality of this social media post. But that's exactly the problem, isn't it? If the story is really about the third man, the third man doesn't even appear in the video. So why is it useful in terms of what you're doing? Why is it you're performing a valuable service by showing the entire video, thus depriving the plaintiff of a market for anybody who wants to see the video? In the service of a story about a person who may or may not be the missing person who does not appear in the video at all. So why do you need to show any of the video in order to service that use? Well, there's audio in the video that involves both people involved, and it's impossible for a viewer to speculate. There's enough in the video that people can speculate, but it's impossible for a viewer to engage in that speculation and understand the virality of the video without actually watching it and having a chance to think, ooh, there might be a clue there, or there might be a clue there. And that's precisely why it went viral at the time, not merely because of my… Why does the user have to see whether there's a clue there? I mean you interviewed the prime suspect of the third man, and he said it wasn't me, and that's the news story, right? Well, yeah, the news story is whether or not it was him. The news story is not something about the nature of the voice or what's – like the details of the video, right? I would argue that that is all about the video. This all is about the virality of the video, the controversy over who was involved, and the fact that – excuse me – and the fact that this person came forward and said it wasn't me contributes to that discussion. And I would also note that I – A moment ago you were sort of suggesting the reason why it's transformative is because the really important thing is the identity of the third man. But now you're saying it's really all about the video and the nature of the video, and the third man like makes it a little bit more interesting, right? But then – but the way you're describing it now suggests that you're just reproducing what the license holder accomplished, which was documenting this interesting incident. Well, I disagree with that, Your Honor. I think that the controversy over who was involved is what the article was about. Okay, but even if we say that it's newsworthy to investigate who the third man is, why does that mean you need to reproduce the entire video? So I'm kind of struck by the idea that the district court says it wasn't possible to use less than the complete video because they embedded another post. But in fact, there's a screenshot from the video in the very same article which is using less of the video than the entire thing. So it just obviously was not impossible to use less than the complete video to accompany the story. Well, Your Honor, it's always possible to use less of something in theory, but it's not always consistent with the transformative intent of something, the transformative purpose of something. I mean what Warhol asked this court to do is look at the transformative purpose, and here we have a purpose for news reporting, which I appreciate is not the end of the discussion, but it is mentioned in Section 107, so you have to give some degree of consistency. Well, it's mentioned in 107. Right, that's true. But you have to understand the – to decide whether it's transformative, you have to understand the purpose of the user in relation to the purpose of the original work. Yes. So one of the purposes in Warhol is that, yeah, well, he does something, but it's all serving the same purpose. Yes. So here isn't the purpose of the original work also news reporting? It is documenting the incident, and then the purpose of your article is also to document the incident and to describe it for news readers. Well, it's the purpose – I would put a contrast here. If the video captured everything that had happened and we were simply reciting everything that happened with this video as illustration, that would be a different circumstance, right? That would be the kind of circumstance that lower courts have consistently held as not fair use. But in this circumstance, there was something left out of the video with enough information that users could speculate on it. So the video itself was the story, not just the incident, but the video of the incident which captured an incomplete picture and had generated controversy. And you can see on – the record's a little bit blurry, but you can see because Town Square embedded the social media post it was reporting on, you can see at the bottom there are notes from other people on social media talking about who was the third man. Somebody reported it was Charleston White. They're correcting it. It wasn't Charleston White. And if you click on that, you can actually go through and see all of the comment section that allows people to appreciate what was going on and speculation. So if the New York Times publishes a news story online and also has a comment section, you could take their story and their comment section and put it on your site and say without paying the New York Times for it, you could say there's this really interesting controversy going on over at the New York Times. They've published this article, and if you want to judge for yourself whether this is fair or unfair to Donald Trump, look at this, read their article, and then read all the comments, and you can figure out whether the New York Times is biased or not. Would that be a permissible use? If the New York Times published a story that omitted a critical fact from a news account and there was controversy in the comment section about what that missing fact was and it was a brief article, this is a brief video, yes, I think it would be appropriate to publish that story. What if it's a long article? One network licenses the right to broadcast the Super Bowl. A controversy develops the game about whether the officiating is terrible or not. And another network says, oh, in order to really judge this, you can't just look at one call. You have to look at the whole game. So we're going to show you the whole game with commentary running along the bottom explaining why we think or don't think or why other people think that all the calls the refs made went in favor of one team. You could do that? Well, I think that that example isn't necessarily analogous to this one. Analogous, excuse me. The difference being just that it's a three-hour broadcast rather than a minute and a half. Yes, but not just that, Your Honor. Sports programming, right, is incredibly creative in terms of the angles that they use, the cameras that they use, the way that they cut together something, right? Yeah, but this is the only available video of the thing that is newsworthy, which is the controversy about whether the game was called properly. Any other video wouldn't have the same controversy. That's really what this comes down to. A different video of this altercation would not have generated the same controversy. Sorry, what does that mean? That means that the controversy was not simply about Michael Jordan intervening. It was about what exactly had happened outside of the corners of this video. The same thing you were describing before about the New York Times omitting a fact. I mean this kind of thing happens all the time. The Washington Post will say the New York Times reported about this event. And we've gotten some more information that, like, this other person was involved or the identity that couldn't be identified sooner is this person or whatever. It is never the case that the Washington Post reproduces the whole article from the New York Times. When it does that, it provides a description. But why is it not just straightforward that you could report the event by saying there is this video that appeared on this other publication's website, there is this controversy over the third man, and now we've done some reporting or investigation to figure out who he was. Why does that necessitate just reproducing the entire video on your own site? Well, I think the difference here is that this was not just taking the video. This was taking the social media post that had generated the controversy and embedding it. And I don't want to discount the other factors here because they really do play in. One of the things the court noted below was that under the third factor, the amount used couldn't actually be less short of a screenshot that did not capture any of that social media material because you can't short the video. Well, I mean you say short of a screenshot, but that seems like a pretty big concession because you could have screenshots of the video. You could have screenshots of some illustrative social media posts, you know, thinking about the controversy. Like that is all short of just reproducing the entire work beginning to end, is it not? So, Your Honor, I would point the court to this court's decision in Swatch Media Group where Bloomberg reproduced an entire earnings call that it was reporting on. It wasn't necessary to reproduce the entire call by that reasoning, but the court still found it fair use because it was newsworthy. The call was newsworthy and Swatch made the determination that readers should be able to view the entire call in order to appreciate them. But isn't the difference there that the call was something that happened in private and it was not originally news reporting? So the original use of this work is there's somebody who is documenting an event. He's engaging in news reporting. He has licensed it to another journalistic outlet to produce on their website. They are engaged in news reporting. So it is already out in the public domain. You are just reproducing what another journalistic outlet has already reported on in your own reporting. So that is not different, right? I would note one thing, which is that it was never pled that the original social media post, I'm not sure what the licensing status of that social media post was. Well, I assume he's not challenging. I don't know. In this case, it's not for us. So the assumption is that it's licensed. Maybe he will separately sue that entity. I don't know. It's not clear. For purposes of my question, let's assume that the original, where it appeared in the original journalistic outlet, that was licensed because the question is whether you're allowed to just reproduce their post. So if you do that, aren't you just doing the same thing that the original post was doing? That seems different than an earnings call that was not otherwise in the public domain or reported on. Well, the earnings call was open, so it wasn't as though it was completely private. It was just maybe there wasn't a public link to it other than the one that Bloomberg had offered. In the same case, it's not clear what the status of this video was in the public domain. We just know that it was posted to social media. But the other thing I want to point out is that it's not clear whether it was in the public domain. We just know that we found it in the public domain on social media. I mean, isn't it just obvious that it was available in the public domain and another outlet like your outlet had produced it, right? I'm not really sure how to answer that question, Your Honor. Okay. I apologize. But one thing I really did want to point out is that because Town Square embedded this article, it not only couldn't use less in the context of embedding, but it also showed the original article being reported on and allowed people to click through. So an embed is not just simply a copy of something. It actually is a link to it. And in order to get more context about it, users can click through and they can see the comment section. They can see the original post. Yeah, but of course Mr. Sanders said that if, in fact, the original article had been a link to the— sorry, if your article had been a link to the original post, that would not have been in use because it would drive traffic to the licensed user. So the fact that you also included a link doesn't seem to save the reproduction of the complete work in your publication. I wouldn't say that by itself it does, but factored into this holistic analysis with the four factors and the many parts of those factors, I think it does work. Yeah, actually, considering that, I'm not sure I understood exactly what you said. The fact that the embed includes a link, does that mean it's dynamic? In other words, that it's not only copying the Twitter use, it's not only copying that as it existed at the time that you copied it, but by following your website, we could actually follow continuing commentary on Twitter? Yes, yes, Your Honor. Isn't that even worse? You're not only stealing everything that's out there that he had, you're also stealing everything that Twitter has. No, no, no, Your Honor. Only if you click through. Not on our website. Oh, I see. Only if you click through. And at the same time, if that video is taken down from Twitter, it's automatically removed from Town Square's website. And I think that that is something that this Court hasn't had a chance to consider in the context of Factor 3, but I do think weighs in because one of the big considerations of video and photo owners is that once something goes online, it's infinitely reproducible. It's like playing whack-a-mole. It's impossible to police something at that point. Isn't that something, if they take it down from the original? The second issue, the other issue in this case about the YouTube video, so if, in fact, users of YouTube are licensed to embed videos that are posted on YouTube, but the license is limited to a use that's one of the available features of YouTube, then that does solve the problem you're talking about, which is everybody knows they can do an embed, but they can't just copy the video and reproduce it in its own way on the website. Well, yes. And so there doesn't seem to be a suggestion in this case that Twitter had a similar license that would authorize it. Twitter does have a similar license. But that would solve the issue that you're talking about. Twitter does have a similar license, but this was a 12C motion where we couldn't make arguments outside the corners of the pleadings, and the pleadings themselves don't establish the licensing relationship. That's why I brought that up earlier. The pleadings themselves don't establish the licensing relationship between Appellant and the Daily Loud, which was the social media account that posted the video. But you're saying that people want clarity about the use of Twitter posts or when they can embed it. The answer is to understand the scope and limits of the license from Twitter, right? Based on the Twitter terms of service, if someone who is either the owner of the copyrights or an authorized licensee of the copyrights posts something on Twitter, it is permitted under the terms of service to embed that. I'm glad you brought up the procedural context here because this is my last question, I guarantee you. This is a judgment on the pleadings, right? There is no discovery. There's no record. You're telling us interesting facts in response to the bench's questions about what Twitter's terms of service might be. We don't really have any of that in the record. We don't even really have the full scope of what is applicable to the YouTube license. We don't know anything about the marketplace. The two parties, I hesitate to rely on this because maybe it just means you're verbose, but the two parties spent 60 pages each talking about this thing and raising all these factual issues and complicated, interesting stories. And you're defending that the district court was able to dispose of this in eight pages on the pleadings without reference to any of those facts. Does that not ring a warning bell that maybe what we need here is to let this case go forward? Maybe in the end of the day you win. But why is this so apparent that this is a fair use, so apparent that the Twitter license covers the universe here, that we can just resolve that, even though the burden of proof is on you, and we can resolve this all on his pleading? How does that work? Your Honor, we can resolve this all on his pleadings. And to the extent our briefing was long, it was because of the legal issues at play, not because of any factual issues. I do want to be clear that the Twitter license is not an argument we made. I was simply explaining why we didn't make the argument and responding to a hypothetical. Okay. We have kept you up. Absolutely. We have kept you up. Hang on one second. I'm sorry. No, that's fine. We have kept you up considerably past your time. I think Judge Menachia has another question. So after that, why don't you answer that and just wrap up. Yes, Your Honor. Okay, so I know that we want to focus on the video, but I am interested in the de minimis question. So, like, if the district court were right that it's always de minimis because one frame is always a small part of a video. I mean, videos are 24 frames a second. So there's an implication of that, that any use of a still image from any video is always going to be de minimis, and so you could just always use it. That seems like a pretty dramatic decision, doesn't it? I don't think the district court held that with respect to any video. The district court held that with respect to videos like this, social media videos, videos that capture real-life events where any single still frame can't capture the physical interaction that's really the core of the video. But why are you saying that it can't capture that? So aren't there going to be some videos where the key thing is – right? So, like, let's say – I mean, I understand maybe you'll dispute the facts here, but, like, let's say the key thing about this video was that Michael Jordan, like, punched some guy. Taking the still frame of him throwing the punch, that is, like, the most important piece of the video, right? So wouldn't just reproducing, like, the key image from a video, that is, like, just copying the essence of the original work, isn't it? I would agree that in some cases where a video is carefully composed and has a great deal of expressive content, where there's a lingering shot, the graduate through the knee of Mrs. Robinson, or a key scene where it turns to color in The Wizard of Oz, yes, there could be circumstances where a single shot carries so much creative content that it could be more than de minimis. But these kinds of videos, these screenshots did not capture any of the important essence of the underlying works. They didn't capture any of the altercation. What was important was what led up to this altercation. How exactly did Michael Jordan find himself in this circumstance? The screenshot does not capture that. And in the Mally Mel videos even more, the content is an interview, and the screenshots do not capture any of the content of the interview. So in these cases, it's de minimis. And I don't think the court below said it could always be de minimis in all circumstances. The court below is saying in these cases. We have your argument. Thank you very much, Mr. Sanders. Mr. Sanders, you have reserved one minute for rebuttal. And because we have heard extensive arguments from both sides, this really is going to be one minute. Last lex. Anything you want to add? Your Honor, unless there are remaining questions from the bench, I would sit right back down. Okay. Very good. Thank you very much. We will take the case under advisement. Thank you very much to both counsel for what were very helpful arguments. Thank you.